In re The **HILLARD DEVELOPMENT CORPORATION**, d/b/a Autumn Breeze Nursing Home, d/b/a Laurens Convalescent Center, d/b/a Pilgrim Manor Nursing Home, d/b/a Provident Nursing Home, Debtor.

The **HILLARD DEVELOPMENT CORPORATION**, d/b/a Autumn Breeze Nursing Home, d/b/a Laurens Convalescent Center, d/b/a Pilgrim Manor Nursing Home, d/b/a Provident Nursing Home, Plaintiff,

v.

Paula R. **GRISWOLD**, Chairman, et al., Defendants.

Bankruptcy No. 90–27588–BKC–AJC.
Adv. No. 94–0467–BKC–AJC.

United States Bankruptcy Court, S.D. Florida.

Aug. 2, 1995.

Thomas O. Bean, Office of Atty. Gen., Boston, MA.

James B. Boone, Fort Lauderdale, FL, for debtor.

Barbara A. Cusumano, Arthur Andersen, LLP, Miami, FL, for examiner.

## MEMORANDUM DECISION ON PLAINTIFF'S MOTION FOR ENTRY OF DAMAGES

A. JAY CRISTOL, Chief Judge.

**THIS CAUSE** came before this Court on Hillard's Motion to Award Damages in Favor of Hillard Development Corporation and Against the Defendants dated November 23, 1994 (the "Motion"). For good cause stated in the Motion, and after an evidentiary hearing before me on December 23, 1994, and based on the other submissions of the parties, for the reasons set forth below, Hillard is hereby awarded $98,732.00 in damages on account of improper disallowances made by the Commonwealth to Hillard's 1992 Cost Reports, $45,606.98 in damages on account of improper recoupments by the Commonwealth, and no money for attorneys' fees and costs.

### FACTS

On March 24, 1993, this Court entered an Agreed Order approving Settlement Agreement and Dismissal of Adversary Complaint between the Debtor and the Defendants settling an adversary proceeding between the parties. Adv. No. 91–1197–BKC–AJC–A. The Settlement Agreement provides that it is to be construed in accordance with Massachusetts law. Settlement Agreement, ¶ 11.

Paragraph 4 of the Settlement Agreement provides as follows:

> 4. Furthermore, **COMMONWEALTH agrees to withdraw and/or waive any and all other rights or claims it may have** or otherwise assert now or in the future against PROVIDENT AND PILGRIM, its agents, officers, shareholders, successors and assigns **for any** payments, **disallowance of costs,** imposition of ceilings, set-off, recoupment or downward adjustment of costs or other limitation on reimbursement of costs, or rates as a result of the rates set forth in paragraph 1 [1] and **for all periods through December 31, 1993.** (emphasis added)

In return, Hillard released the Commonwealth from any and all claims, liabilities, actions, causes of action and damages which could have been asserted in either Hillard's 1990 Bankruptcy proceeding or the pending adversary proceeding. The wording of the mutual waiver was very broad and no reference was made to specific categories of claims, rates, or costs waived. The Settlement Agreement also established final prospective rates for the two nursing homes for the years ending December 31, 1992 and 1993. The Agreement did not set forth the method that was used to calculate the stipulated 1992 or 1993 rates or the basis that might be used to calculate rates for 1994.

Approximately three months after execution of the Settlement Agreement, Hillard filed its Cost Reports with the Commission for its Provident and Pilgrim Manor Nursing Homes. Def. Ex. 2 and 4. The Cost Reports are both a report of the financial condition of the facility *and* a claim for reimbursement. However, the Cost Reports also include Schedules which set out "non-allowable" expenses and represent costs which are not being "claimed"—although they are not being claimed because they are, in fact, non-allowable.

For example, Schedule XIII of Pilgrim Manor's Cost Report states under the heading *Detail of Non–Allowable Expenses:*

> **Listed below are expenses which are not being claimed and which the Commission Type I (computer) adjustments process will automatically adjust. It is necessary to fill out this section. This is included in the report so that providers**

---

1. In paragraph 1 of the Stipulation, the parties stipulated to the amount of Hillard's nursing homes' final prospective rates for calendar years 1992 and 1993.

will know which accounts will be automatically adjusted.

Therefore, in certain Schedules, Hillard claimed reimbursement for certain costs, but did not claim reimbursement for other costs. Specifically, on pages 28–33 of its Cost Reports, Hillard itemized its non-allowable expenses which were not being "claimed" (the "Non-allowable Expenses"). The non-allowable expenses for which Hillard did not seek reimbursement are not related to "public patient care." Transcript ("Tr. at ____") at 63, 76, 88.

The Commonwealth disallowed claimed allowable costs by Provident in the amount of $177,280 and by Pilgrim in the amount of $12,753. Def. Ex. 1 under column heading "Disallowed." The Commonwealth allowed Provident reimbursement in the amount of $20,805, and Pilgrim reimbursement in the amount of $70,496. *Id.* under column heading "Additional Reimbursement." Thus, the Commonwealth disallowed *claimed allowable* costs in the net amount of $98,732. *Id.* in row entitled "Total Net Amount for Both Facilities." *All* of Hillard's reported non-allowable costs were disallowed.

On May 27, 1994 Hillard filed the instant adversary to declare or enforce the terms of the Settlement Agreement. On August 5, 1994 Hillard moved for Summary Judgment. There were two issues: 1) Hillard claimed that the Commonwealth improperly disallowed $1.2 million in costs on Hillard's 1992 year end Cost Reports in violation of the Settlement Agreement, which has had the effect of lowering the nursing homes' 1994 reimbursement rates; and 2) Hillard claimed that the Commonwealth improperly recouped funds from reimbursements issued to Hillard for its 1992 claims, in violation of the Settlement Agreement.

On November 3, 1994 this Court entered its Memorandum Order Granting Hillard's Motion for Summary Judgment, wherein the Court concluded that the Settlement Agreement between the parties "was a complete waiver of all claims of the Commonwealth against the Plaintiff for, among other things, any disallowance of costs...." Thus, the Court has found that the Commonwealth waived its rights to any disallowance of costs

for all periods through December 31, 1993. The issue remains as to how much, if any, 1992 costs were disallowed by the Commonwealth thereby resulting in reduced rates of Medicaid payments to Hillard during 1994.

On November 23, 1993, Hillard filed it's Motion to Award Damages and on December 23, the Court held an evidentiary hearing on the amounts improperly disallowed by the Commonwealth.

## CONCLUSIONS OF LAW

**I. DOES COMMONWEALTH'S WAIVER OF ITS RIGHTS TO ANY DISALLOWANCE OF COSTS INCLUDE "NON-ALLOWABLE," AND THUS UNCLAIMED, COSTS REPORTED BY HILLARD?**

The Commonwealth contends it did not agree in the Settlement Agreement to reimburse Hillard for costs which are automatically disallowed by the Massachusetts Rate Setting Commission (the "Commission") as "non-allowable expenses." In fact, providers are not reimbursed for reported costs. Rather, Medicaid providers are reimbursed for the *claims* they submit for providing patient care. The Commonwealth merely uses the information of the Cost Reports submitted by nursing homes to calculate prospective reimbursement *rates* for claims. The Commonwealth argues that because Hillard merely reported but did not seek reimbursement for certain costs, the Commonwealth did not have a "claim" or "right" to disallow those costs. If it did not hold a claim, the Commonwealth submits, it could not have "waived" that claim for disallowance. As such, the Settlement Agreement does not entitle Hillard to have the reported but unclaimed costs included in the assessment of damages for amounts wrongfully disallowed by the Commonwealth, or included in its 1994 medicaid reimbursement rates.

Finally, the Commonwealth argues, if the Court were to conclude that the Settlement Agreement does require the Commonwealth to include Hillard's reported but unclaimed costs, the Court should not award the damages requested by Hillard because then the

Settlement Agreement would violate Massachusetts law.

Hillard maintains that it is entitled to damages for *all* disallowed reported costs. Hillard argues that under the Settlement Agreement it is entitled to a medicaid reimbursement rate that includes all reported costs, regardless of whether those costs were "nonallowable expenses" or claimed allowable expenses, and regardless of whether the Medicaid rate calculation process automatically disallows certain costs from yearly rates. Hillard claims that the 1994 rates set for the Pilgrim and Provident nursing homes are lower than they should be because the Commonwealth improperly disallowed costs from Hillard's 1992 Cost Reports.[2]

Under Title XIX of the Social Security Act, the federal government provides federal assistance to states that participate in the Medicaid program. 42 U.S.C. § 1396, *et seq.* To be eligible to participate in the Medicaid program, a state must adopt a "State Plan," approved by the federal Health and Human Services agency. 42 U.S.C. § 1396b(a). The State Plan must meet all the requirements of Subpart C of 42 C.F.R. Ch. IV, "Payment for Inpatient Hospital and Long–Term Facility Services". 42 C.F.R. § 447.252(a). *See* 42 C.F.R. 447.253(i) ("the Medicaid agency must pay for ... long term care services using rates determined in accordance with methods and standards specified in an approved State plan.") Under Massachusetts law, the Commission is required to follow the provisions of the State Plan in establishing rates of reimbursement to nursing facilities. G.L. c. 6A, § 32.[3] The Supreme Judicial Court has held that the Commission, in "establishing ... rates of reimbursement, must follow the requirements and objectives of the State plan and of Federal Medicaid statutes and regulations." *Youville Hosp. v. Commonwealth,* 416 Mass. 142, 146, 617 N.E.2d 605 (1993).

■ Further, if the state medicaid agency complies with the State Plan, the federal government reimburses the state for some percentage of the medicaid reimbursement payments it makes. 42 U.S.C. § 1396b(a). The Court notes that Massachusetts law prohibits the Commonwealth from making any Medicaid reimbursements that do not qualify for federal reimbursement. Under 114.2 Code of Massachusetts Regulations ("CMR") 5.05(1)(a), for a cost to be "allowed" by the Commission in calculating a reimbursement rate, that cost must be "ordinary, necessary and directly related to the care of publicly-aided patients." Non-allowable expenses which are not being claimed do not directly relate to care of publicly-aided patients. Tr. at 63, 76, 78.

■ Under Hillard's construction of the Settlement Agreement, the unclaimed costs would have to be allowed by the Commission even though they do not relate to the care of publicly-aided patients. Further, 114.2 CMR 5.05(4) identifies "non-allowable costs." Hillard's unclaimed costs are included among the non-allowable costs enumerated therein.[4]

Hillard contends that it did not seek reimbursement for the non-allowable expenses

---

**2.** The 1994 Medicaid reimbursement rates are calculated based on the 1992 costs reported by nursing home providers.

**3.** More specifically, the seventeenth paragraph of G.L. c. 6A, § 32, provides, in pertinent part, as follows:
> ... when establishing ... rates of reimbursement to providers under Title XIX, the commission shall ... follow the requirements and objectives of the Title XIX state plan, as administered by the department and of the federal statutes and regulations promulgated under Title XIX itself.

The twentieth paragraph of the section further provides:
> Every rate, classification and other regulation established by the commission shall be consistent where applicable with the principles of reimbursement for provider costs in effect from time to time under Titles XVIII and XIX of the Social Security Act governing reimbursement or grants available to the to the commonwealth, its departments, agencies, boards, commissions or political subdivisions for general health supplies, care, and rehabilitative services and accommodations.

**4.** For instance, some of the disputed costs Hillard alleges were wrongfully disallowed are the fixed costs of operating the nursing homes, such as salaries and overhead, which the Commonwealth requires its Medicaid providers to report for purposes of establishing prospective rates. These costs are reported for information purposes, not for reimbursement, and are automatically disallowed by the Commonwealth's claims system.

because the cost reports were filed as of December 31, 1992, a date three months prior to execution of the Settlement Agreement. Hillard's argument is without merit. Hillard filed its "amended" cost reports three months after execution of the Settlement Agreement. Tr. 74 and Def. Ex. 2 and 4. Thus, even though the Cost Reports covered the period through December 31, 1992, if Hillard genuinely believed when it filed the amended Cost Reports in June 1993 that the Settlement Agreement entitled it to reimbursement for all costs, it could have claimed them. Some providers do claim reimbursement for all costs. Tr. 79.

Alternatively, Hillard could have made some reference in the cost report to the Settlement Agreement, and its right to be reimbursed for costs generally "non-allowable." Page 34 of the Cost Reports provided an opportunity for Hillard to refer to "footnotes and explanations." Hillard did provide some information in this section. Yet, it made *no* reference to the Settlement Agreement or its entitlement to unclaimed non-allowable amounts. Furthermore, as the Settlement Agreement was executed in March 1993, the Commonwealth could not have waived a claim on account of a cost report that was not filed until June 1993. Accordingly, the Court concludes that the Commonwealth's waiver of its rights to "any disallowance of costs" did not include non-allowable unclaimed costs reported by Hillard which are automatically disallowed by the Medicaid rate calculation process.

## II. WERE AMOUNTS IMPROPERLY RECOUPED BY THE COMMONWEALTH OR WERE DOUBLE–PAYMENTS MADE TO HILLARD BY THE COMMONWEALTH?

In 1993 the Commonwealth began recouping funds from the reimbursements it was issuing to Hillard for its 1992 claims. Hillard objected to the withholding because the 1993 agreement waived any disallowance the Commonwealth might have in regard to Hillard's 1992 claims. To make matters more confusing, in addition to withholding funds, the Commonwealth also paid some claims twice as a result of claims processing errors. The result was a series of confused debits and credits. At the conclusion of the evidentiary hearing on Hillard's Motion to Award Damages, the Court directed the appointment of an Examiner, pursuant to 11 U.S.C. § 105, to determine whether the Commonwealth improperly recouped amounts from Hillard or whether double-payments were made by the Commonwealth to Hillard. The Examiner performed an initial investigation and presented his Examiner's Findings and Recommendations and oral testimony to the Court on March 29, 1995.

Subsequently the Examiner filed an Amended and, on June 8, 1995, Second Amended Examiner's Report and Recommendations which provided a detailed narrative of the facts which led up to the Examiner's conclusion in the Amended Report.[5] In analyzing the procedure for which the Commonwealth via the Massachusetts Division of Medicaid Assistance (the "Division") "recoups" alleged "overpayments," the Examiner provided the following explanation.

Under Massachusetts law, when a nursing home provider such as Pilgrim Manor or Provident files a claim for payment of services from the Medicaid program, the Division will pay the claim within 45 days. At some point after the Division pays the claims, perhaps as much as a year or two later, the Division reviews those claims to determine whether they were properly remitted. If the Division determines that a claim was not filed with the proper documentation, it will notify the provider and give the provider the opportunity to respond. The provider may

---

5. The documents reviewed by the Examiner included, but were not limited to, the court file on Adv. Proceeding No. 94–0467–BKC–AJC–A, inclusive of the Settlement Agreement, Agreed Order, Plaintiff's Exhibits, remittance advices, including, but not limited to 1145, 1177, 1178, 1179, 1180, 1182, 1183, 1184, 1185, 5187, 1187, 1188, 5188, 1189, 1197, 1200, 1201, 1202, 1204, 1209, 1211, and 1215, Defendants' Exhibits,

transcript of the December 23, 1994 hearing before the Court, Summary Judgment Order and spoke with the Commonwealth's attorney, Thomas O. Bean, and met with Hillard's attorney, James B. Boone. The Examiner also reviewed a memorandum prepared by Attorney Bean dated March 3, 1995 and the Recoupment summary provided by Attorney Boone.

then appeal the Division's determination or resubmit the claim with the proper documentation.

If the provider does not appeal the Division's determination that the claims were improperly filed or resubmit the claim properly, the Division may "withhold" from ordinary course payments (i.e., current payments for unrelated claims) the amount that it paid on account of improperly submitted claims. "Withholding" refers to the process by which the Division places monies it otherwise would have paid the provider for services rendered in the ordinary course into a specifically designated account. This account, referred to as a "sanction" account, is in the nature of an escrow account in that neither the provider nor the Division has use of the monies. If the provider does properly resubmit the claim, the money is released to the provider. If the claims are not resubmitted properly, the Division may "recoup" the amount withheld.[6]

### A. *Recoupments*

Hillard submitted claims for patient services rendered prior to December 31, 1993. The Commonwealth allegedly paid these claims. In 1994, the Commonwealth disputed the paid claims in the initial aggregate amount of $280,859.34. Thus, in March of 1994, the Commonwealth set up a "sanction" account with an initial opening balance of $280,859.34.

Once the Commonwealth set up the "sanction" account, the Division and Hillard, through its agent, engaged in the dispute resolution process as outlined by Massachusetts law. During the period of time from March 29, 1994 through July 19, 1994, the Commonwealth made certain memo entries wherein the initial "sanction" account balance was reduced by $195,374.22 During the same period, the Commonwealth "recouped" against the "sanction" account balance a net amount of $85,484.78 as evidenced in remit-

tance advices 1177, 1178, 1179, 1180, 1182, 1183, 1184, 1185, 1188, 1189, and 1197.

In addition to the "sanction" account, on May 24, 1994, the Commonwealth established a separate "recoupment" account with an initial opening balance of $234,090.33. As referenced in run 1187, the "recoupment" account was established as a result of disputed and "voided" remittance advices submitted by Hillard prior to December 31, 1993. During the period of time from September 21, 1993 through November 1, 1994, certain memo entries were made wherein the initial "recoupment" account balance was reduced by $55,883.02. During the same period, the Commonwealth "recouped" against the "recoupment" account a net amount of $178,207.31, as evidenced in remittance advices 1145, 1197, 1201, 1202, 1204, and 1215.

Accordingly the Examiner purports that the net amount improperly "recouped" by the Commonwealth is $263,692.09 ($85,484.78 representing amounts recouped from the "sanction" account and $178,207.31 representing amounts recouped from the "recoupment" account).

### B. *Double-payments*

■ The Examiner found that a double-payment had been made by the Commonwealth to Hillard in the approximate amount of $239,638.00. This overpayment of $239,-638.00 is comprised of $218,085.11 for service date prior to December 31, 1993, and $21,-552.89 for service dates in 1994. Prior to December 31, 1993, Hillard provided services to a number of patients and submitted remittances advices to the Commonwealth. The Commonwealth paid Hillard. Subsequently, the Commonwealth disputed and "voided" the referenced remittance advices as noted on Run 1187, and set up a "recoupment" account with an opening balance of $234,-090.33. Hillard re-submitted, and the Commonwealth accepted the disputed and "voided" remittance advices. On August 9, 1994 the Commonwealth paid Hillard another

---

**6.** The Examiner found the distinction given by the Commonwealth between "withholding" and "recoupment" to be semantical at best. Although the terms given to the disputed funds purportedly represent different treatment during the state imposed dispute process, the net effect

was that the Commonwealth ultimately "recouped" against ordinary course payments due Hillard on unrelated post-December 31, 1993 claims for disputed claims filed on or before December 31, 1993.

$239,638.00 as evidenced by check no. 51474870. A review of Run 1200 indicates that the patient services paid in Run 1200 included the same patient services paid and the "voided" in Run 1187. Further, a portion of the $239,638.00 overpayment was properly "recouped" since it applied to services performed and paid after December 31, 1993.

Hillard argues that it should be allowed to keep the $218,085.11 overpayment for services dates prior to December 31, 1993 because the Commonwealth specifically waived any right to recover overpayments relating to the 1992 claims year. However, while the overpayment did relate back to 1992 claims, it was not made until seventeen months after the 1993 Settlement Agreement was signed. It would be a stretch to construe the Settlement Agreement as waiving an overpayment that had not even occurred and thus could not have been contemplated by the parties when they entered into the Settlement Agreement. Hillard's interpretation of the Settlement Agreement would result in a windfall for these two nursing homes.

Accordingly, the net amount due Hillard ($263,692.09 in improper set-offs by the Commonwealth, less the $218,085.11 double-payment to Hillard for service dates prior to December 31, 1993) is $45,606.98. The overpayment of $21,552.89, which relates to service dates after December 31, 1993, should be handled in the ordinary course of business between Plaintiff and Defendant as they are outside the applicable period for dates of service relating to overpayments under the Settlement Agreement.

### III. *ATTORNEYS' FEES AND COSTS ARISING FROM THE COMMONWEALTH'S BREACH OF THE SETTLEMENT AGREEMENT*

Hillard requests the sum of $20,340.00 for attorneys fees and $703.36 in costs to bring this action to enforce the Settlement Agreement. The Commonwealth argues that under the terms of the Settlement Agreement each party agreed to bear its own costs.

In paragraph 16 of the Order, this Court stated that the only issue remaining to be decided is damages to be awarded to Hillard under Counts I and III of Hillard's complaint. Although Count I was styled as a count for declaratory judgment and Count III a count for breach of contract, both concerned construction of the Settlement Agreement. Regardless of Hillard's characterization of its action, it is not entitled to attorneys' fees or costs under the terms of the Settlement Agreement.

■ In paragraph 9 of the Settlement Agreement, the parties agreed that neither would be entitled to recover attorneys' fees or costs "in connection with" the adversary proceeding. That paragraph provides:

> The parties have agreed that each party will bear its own costs and attorneys fees *in connection with said adversary proceeding.* (emphasis added)

As Counts I and III are actions to declare or enforce the terms of the Settlement Agreement, they are actions "in connection with said adversary proceeding." Accordingly, Hillard is not entitled to attorneys' fees or costs. While it may have been improvident of Hillard to agree to such terms, these are the terms to which both parties agreed under the Settlement Agreement and Hillard must live with it.

■ Hillard claims that this adversary proceeding is separate from the action in which the Settlement Agreement was entered. Its arguments are unavailing for two reasons. First, as noted above, this adversary proceeding concerns the Settlement Agreement. It is therefore one that is "in connection with" the adversary proceeding in which the Settlement Agreement was entered. Second, Hillard should have filed this action as a motion for enforcement of the Settlement Agreement, rather than as a separate adversary proceeding. If this had occurred, Hillard could not even argue that this proceeding is one not "in connection with" the one in which the Settlement Agreement was entered. Hillard may not recover attorneys' fees simply by virtue of the way it has styled its action.

■ Furthermore, Hillard's action is one for declaratory judgment and breach of contract. In the Settlement Agreement, the parties expressly agreed that the Settlement

Agreement shall be construed and governed by Massachusetts law. Settlement Agreement, ¶ 11. Under Massachusetts law, the general rule is that a plaintiff may not recover attorneys' fees in an action for declaratory judgment or breach of contract. More specifically, the Supreme Judicial Court has held in an action for breach of contract, that "counsel fees generally are not recoverable in this Commonwealth in the absence of statutory authorization." *Kohl v. Silver Lake Motors*, 369 Mass. 795, 801, 343 N.E.2d 375 (1976). *See Rozene v. Sverid*, 4 Mass.App. Ct. 461, 466 n. 6, 351 N.E.2d 541 (1976) (in an action for breach of contract to sell land, the court declined to depart from the general rule that each litigant must assume the burden of counsel fees). Similarly, it has held that attorneys' fees may not be awarded in a declaratory judgment action. *Ellis v. Board of Selectmen of Barnstable*, 361 Mass. 794, 802, 282 N.E.2d 637 (1972). Finally, even costs may not be awarded against the Commonwealth absent "specific affirmative authority." *M.C. v. Commissioner of Correction*, 399 Mass. 909, 912, 507 N.E.2d 253 (1987). Hillard has failed to cite any authority to support its claim for attorneys' fees or costs. Indeed, there is none. In short, this is a "plain vanilla" action for breach of contract and declaratory judgment. As such, Hillard is not entitled to attorneys' fees.

### CONCLUSION

For the foregoing reasons, this Court awards Hillard $98,732.00 in damages on account of its claim for adjustments to its 1994 rates, $45,606.98 in damages on account of improper recoupments by the Commonwealth, and no money for attorneys' fees and costs. A separate order will be entered in conformity with Rule 9021.

